UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

PAULETTE M. WILLIAMS,

                    Plaintiff,

-against-

THE MOUNT SINAI MEDICAL CENTER and
1199 SERVICE EMPLOYEES INTERNATIONAL
UNION UNITED HEALTHCARE
WORKERS EAST,

                    Defendants,

------------------------------------------------------------------x

**JUDGE SULLIVAN**

Civil Action No.: 

**COMPLAINT WITH
JURY DEMAND**

Plaintiff Paulette M. Williams ("Williams" or "plaintiff"), by her attorneys, Ballon Stoll Bader & Nadler, P.C., complaining of defendants, The Mount Sinai Medical Center ("Mt. Sinai") and 1199 Service Employees International Union United Healthcare Workers East ("SEIU") (collectively "defendants"), alleges the following upon information and belief:

1.     This is an action brought to remedy breach of contract; unlawful termination of plaintiff; discrimination based on disability for defendants' disparate treatment based on her disability, in violation of the New York State Human Rights Law § 296, *et seq.* ("Executive Law") and the New York City Human Rights Law §8-107 *et seq.* ("Administrative Code"); and breach of Duty of Fair Representation in violation of New York City Collective Bargaining Law § 12-306(b)(3).

## JURISDICTION AND PARTIES

2.     Plaintiff is a "disabled" woman within the meaning of Executive Law § 292(21) and Administrative Code § 8-102(16) and residing at 2036 Nereid Avenue, Bronx, New York 10466.

3.  During all relevant times hereinafter mentioned, plaintiff has been an "employee" within the meaning of the Executive Law § 292(1) and the Administrative Code § 8-102(1).

4.  Defendant Mt. Sinai is an "employer" within the meaning of Labor Management Relations Act ("LMRA") 29 U.S.C. § 185, Executive Law § 292(5) and Administrative Code § 8-102(5).

5.  Defendant SEIU, is a labor organization representing employees in works affecting interstate commerce as defined in Sections 501 of the LMRA 29 U.S.C.A. §§ 142(1) and (3) and 29 U.S.C.A. §152(5), and within the meaning of Section 301 of the LMRA 29 U.S.C. § 185.

6.  During all times herein mentioned, SEIU was the certified collective bargaining agent for all of Mt. Sinai's employees.

7.  This Court has jurisdiction over claims arising under 42 U.S.C. §12101, *et seq.*

8.  Plaintiff requests this Court to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all of plaintiff's New York state law claims.

## FACTS COMMON TO ALL CLAIMS

9.  On May 31, 1989, plaintiff began her employment with defendant Mt. Sinai whereby plaintiff began her more than twenty (20) year career at Mt. Sinai with a starting position in the kitchen of the hospital as part of the food service staff, hoping to move to the Nursing Division.

10. In 1991, plaintiff was promoted and transferred to the Nursing Division at Mt. Sinai as a Patient Care Associate ("PCA") and was assigned to the Intensive Care Unit ("ICU") at Mt. Sinai.

11. In or about 1993, approximately two years after working at the ICU, plaintiff was transferred to the Mother & Baby Pediatric Unit ("MBP") where she assumed additional job requirements as a PCA, during which time, plaintiff attended classes to increase her workplace productivity by mastering job-related skills such as drawing blood and administering Electrocardiograms ("EKG").

12. Starting in or about 1995 until October 2009, after spending approximately two years in the MBP unit, plaintiff was assigned to the Rehabilitation Unit ("RU") where she began assisting patients with spinal cord injuries.

13. At the inception of working at the RU, plaintiff's first supervisor Mr. Ginsberg ("Ginsberg"). Plaintiff and Ginsberg had a good relationship without any problems.

14. In or about 1996, Jill Goldstein ("Goldstein") became plaintiff's supervisor at the RU. Plaintiff and Ms. Goldstein had a good relationship without any problems.

15. Subsequently, in or about 1997, plaintiff became under the direct supervision of Lou-Ann London ("London"). Plaintiff and London had a problem free, professional relationship, without any problems.

16. In the RU department, in addition to her prior duties, plaintiff was also required to perform more heavy lifting of patients with spinal cord injuries who are generally paralyzed in certain areas of their bodies and require assistance while engaging in activities such as moving from a bed to a wheel chair.

17. In or about 2005, plaintiff moved to the fourth floor of the RU which is dedicated to patients recovering from brain injuries and/or strokes.

18.     While on the fourth floor, plaintiff generally assisted patients who suffered from strokes and other brain injuries in all their needs. Plaintiff's duties, however, included drawing blood, weighing patients and assisting patients in a variety of ways.

19.     London continued to supervise plaintiff until Deborah Ramsay ("Ramsay") assumed London's role as the fourth floor supervisor, and remained as plaintiff's supervisor for approximately one year until plaintiff's termination.

## FACTS PERTAINING TO DISABILITY

20.     During plaintiff's employment, she experienced continuous, unwelcomed treatment from PCAs Tracey McCloy ("McCloy") and Linda Lenard ("Lenard"), where for example, in or about 2007, while plaintiff was talking to PCA Vida Wilson at the nursing station, McCloy passed by and took a picture of plaintiff with the camera on her cell phone and sent it to supervisor Larry Blackman ("Blackman"). Subsequently, one of plaintiff's co-workers, Brenda Charles ("Charles"), called plaintiff to tell her that someone approached her and said that plaintiff will be fired because McCloy took a picture of plaintiff allegedly sleeping and gave it to supervisor Blackman.

21.     Due to and following the incident described in paragraph 20 above, plaintiff became anxious and stressed at work fearing for the possibility of losing the job which she kept for over twenty years and to which she was so loyal and dedicated.

22.     Defendant Mt. Sinai was aware of that incident of the impact it had on plaintiff.

23.     Furthermore, plaintiff was diagnosed with hypertension (also referred to as high blood pressure) (hereinafter sometimes referred to as plaintiff's "medical condition" or "disability"), and needed to take the following three prescription medications on a daily basis:

   a. Toprol-XL (200 mg) which is used to treat angina (chest pain) and hypertension (high blood pressure). It is also used to treat or prevent heart attacks;

   b. Hyzaar (hydrochlorothiazide and losartan, 100 mg) which is used to treat high blood pressure and to reduce the risk of stroke in people with hypertension; and

   c. Methyldopa (300 mg) which is used to lower blood pressure.

24. Throughout the years, plaintiff was forced to take a few days off from work, sometimes by orders from her doctors, for treatment of her medical condition.

25. Defendant Mt. Sinai was clearly aware of plaintiff's medical condition and the medical treatment she received for her medical condition since plaintiff's doctor would regularly send her medical reports to Mt. Sinai, and would send medical notes to Mt. Sinai when plaintiff was occasionally out of work due to her medical condition.

26. Defendant Mt. Sinai's employees, including but not limited to plaintiff's supervisors and co-workers, and Mt. Sinai's Human Resources personnel and other decision-makers responsible for hiring and firing employees, were all clearly aware of plaintiff's medical condition and the medical treatment she received for her medical condition.

27. Despite plaintiff's disability, plaintiff was fully capable and willing to perform her job duties and requirements.

## FACTS PERTAINING TO WRONGFUL TERMINATION

28. On the evening of October 2, 2009, plaintiff reported to work for her 11:15 p.m. shift.

29. On arrival, plaintiff relieved PCA Lenard who covered the room from 3pm-11pm and who was assigned a two-to-one observation.[1] However, no one instructed plaintiff of her level of observation or gave her a report status change.

30. As is customary at Mt. Sinai, PCAs would find out there levels of assignments to each room in one of two ways: either (1) by personally checking the assignment chart at the nurse's station; or (2) when another PCA and the nurse who checks on each PCA covering a shift would instruct the incoming PCA of the levels of observation assigned for that specific room.

31. On the evening of October 2, 2009, right before changing shifts, PCA Clamita gave specific information to plaintiff regarding both patients in the room plaintiff was assigned to that evening (e.g., Lenard told plaintiff that patient in bed A did not like the light and patient in bed B was a walker), but failed to inform plaintiff that the level of observation for that room changed and became a One-to-One Observation and that plaintiff was supposed to observe Ms. Morris, a patient in that room.

32. Thus, plaintiff reasonably believed that she was responsible for both patients in the room pursuant to Lenard's instructions and pursuant to the common practice used at Mt. Sinai (no nurse ever came into plaintiff's room to provide her with the status of the patients in her room or give her other instructions).

33. On October 2, 2009, while plaintiff was assisting one of the patients in the room by re-positioning the patient in her bed, a task which did not require the help of another nurse, Ms. Morris got up and wandered out of the room and into the nursing room across the hall.

---

[1] One-to-One Observation: a ratio of 1 staff member assigned to 1 patient.
Two-to-One Observation: a ratio of 1 staff member assigned to 2 patients.

34. Nurse Jackie, who was sitting in the nursing room, brought Ms. Morris back to the room and told plaintiff that her patient had asked to go to the restroom. *However, Ms. Morris never asked plaintiff to go to the restroom.*

35. In fact, immediately after returning to the room, plaintiff took Ms. Morris to the restroom, but it turned out that Ms. Morris did not need to use the restroom. Ms. Morris seemed actually confused about her needs.

36. It was at that point, and for the first time, that plaintiff was notified that she was assigned to a One-to-One level of observation and was scheduled only to watch Ms. Morris and not both patients. Plaintiff immediately complied with her assignment to observe Ms. Morris until her shift ended at 7:15 a.m.

37. Subsequently, supervisor Ramsay called plaintiff mid-day on that Friday, October 2, 2009, and requested that plaintiff explain the incident both verbally and in writing. Plaintiff promptly complied with her supervisor's request.

38. Later that same day, at 11 p.m., supervisor Denise Eddie ("Eddie") gave plaintiff a suspension notice at the nurses' office and told her to call the hospital daily for an update on her suspension. During her suspension, plaintiff called the office every day for five days pending the investigation.

39. When plaintiff called the following Friday, October 9, 2009, she was told to come into the office with her delegate. When she went to the office, plaintiff was informed that she was terminated and was given a termination letter.

40. Upon information and belief, the decision makers at Mt. Sinai, including but not limited to plaintiff's supervisors and personnel in Mt. Sinai's Human Resources Department, had no reasonable basis for terminating plaintiff's employment.

41. Upon information and belief, the decision makers at Mt. Sinai, including but not limited to plaintiff's supervisors and personnel in Mt. Sinai's Human Resources Department, had knowledge of plaintiff's medical condition and terminated plaintiff's employment on whole or in part on the basis of plaintiff's medical condition.

42. Upon information and belief, employees of Mt. Sinai similarly situated to plaintiff, who were not disabled and were not properly informed of additional duties and responsibilities, did not have their employment terminated by Mt. Sinai.

## FACTS PERTAINING TO BREACH OF DUTY OF FAIR REPRESENTATION

43. Immediately after being terminated, pursuant to the Collective Bargaining Agreement between Mt. Sinai and SEIU (the "CBA"), plaintiff requested an appeal through the Chapter Hearing Appeal Board of Mt. Sinai to discuss plaintiff's suspension and subsequent termination. At the first hearing with Audrey, Director of Rehab Division, the following individuals were present, Deborah Ramsay, from Labor Relations, plaintiff's delegate from SEIU, Henry King and Organizer Juliana Sherman.

44. Several months after the hearing was completed, plaintiff was informed by letter dated January 13, 2010, that her claim was denied and that plaintiff's grievance did not warrant arbitration. Plaintiff appealed the decision by letter within the 72-hour deadline to the Vice President of SEIU, Saily Cabral, on January 15, 2010.

45. A meeting to hear plaintiff's grievance on was held on January 27, 2010 by the Chapter Hearing & Appeals Board of Mt. Sinai. However, by letter dated February 8, 2010 the Board refused to submit plaintiff's case to arbitration.

46.     Upon information and belief, SEIU's decision not to submit plaintiff's case to arbitration, a right granted to SEIU members under the CBA, was intentional, malicious, arbitrary and capricious.

47.     Plaintiff appealed again the Board's decision by letter within the 72-hour deadline to Executive Vice President Angela Doyle ("Doyle") on February 10, 2010. Subsequently, due to defendant's failure to acknowledge or respond to plaintiff's letter, plaintiff emailed Doyle on April 21, 2010 (more than two month later) for an update on her case since she had not received any response.

48.     Finally, on June 2, 2010 SEIU scheduled an internal hearing with the SEIU's Health Systems Hearings and Appeals for June 16, 2010. However blatantly and without any basis and in direct violation of plaintiff's rights and her reasonable request to have the attorney of her choice be present at the internal union hearing, SEIU prohibited and disallowed the presence of plaintiff's attorney.

49.     However, plaintiff stated to SEIU that she would not appear be able at the union hearing without her personal legal representative present.

50.     Plaintiff's personal attorney, Marshall B. Bellovin, Esq., on plaintiff's behalf, forwarded a letter dated June 15, 2010 to SEIU objecting to SEIU's position and requesting that SEIU adjourn the hearing pending their response to his June 15, 2010 letter.

51.     However, in complete disregard to plaintiff's attorney's letter dated June 15, 2010, SEIU apparently proceeded with the internal hearing on June 16, 2010, and upon information and belief plaintiff was again denied her arbitration.

## FACTS PERTAINING TO DEPARTMENT OF LABOR'S DECISION THAT PLAINTIFF IS ENTITLED TO UNEMPLOYMENT BENEFITS

52. On October 3, 2009, the Department of Labor issued the initial determination disqualifying plaintiff from receiving unemployment benefits pursuant to Labor Law § 593 (3) on the basis that plaintiff lost employment through misconduct. However, plaintiff requested a hearing on December 22, 2009.

53. On February 10, 2010, Administrative Law Judge Rosalie Wohlstatter overruled the initial determination, finding that in plaintiff's twenty years with Mt. Sinai, she was never warned about patient care or not checking at the nurse's station. The judge concluded that "the isolated incident did not constitute misconduct and that claimant lost her job under non-disqualifying circumstances." Judge Wohlstatter's decision is annexed hereto as **Exhibit 1.**

54. Defendant Mt. Sinai Hospital appealed, and the decision was affirmed.

## FIRST CLAIM

### (Breach of Contract as against Mt. Sinai)

55. Defendant Mt. Sinai breached the CBA when it wrongfully terminated plaintiff, a member in good standing of SIEU, a party to the CBA, in contravention to plaintiff's rights set forth in the CBA.

56. As a result of defendant Mt. Sinai's wrongful termination of plaintiff, plaintiff has lost and will lose front and back wages and benefits, and has incurred and will incur damages thereby.

## SECOND CLAIM

### Discrimination Based Upon Disability In Violation of the New York State Human Rights Law [State Claim] as against Mt. Sinai

57.  Defendant Mt. Sinai discriminated against plaintiff, because of disability, when it terminated plaintiff in violation of Executive Law § 296, *et seq.*

58.  As a result of defendant Mt. Sinai's discriminatory practices, plaintiff has lost and will lose front and back wages and benefits; has suffered and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred and will incur damages thereby.

## THIRD CLAIM

### Discrimination Based Upon Disability In Violation of New York City Human Rights Law [City Claim] as against Mt. Sinai

59.  Defendant Mt. Sinai discriminated against plaintiff, because of her known disability, when it terminated plaintiff in violation of Administrative Code § 8-107, *et seq.*

60.  As a result of defendant Mt. Sinai's discriminatory practices, plaintiff has lost and will lose front and back wages and benefits; has suffered and will suffer mental anguish, emotional distress and loss of enjoyment of life; and has incurred and will incur damages thereby.

## FOURTH CLAIM

### (Breach of Duty of Fair Representation [City Claim] as against SEIU)

61.  Defendant SEIU failed to properly and fairly represent plaintiff in its wrongful termination and discrimination claims against defendant Mt. Sinai and refused to allow plaintiff to have her attorney of choice present at her appeal hearing in violation of New York City CBL § 12-306(b)(3), *et seq.*

62. As a result of defendant SEIU's breach of duty of fair representation, plaintiff has lost and will lose front and back wages and benefits; and has incurred and will incur damages thereby.

**WHEREFORE**, plaintiff prays that judgment be entered against defendants awarding lost back and front wages and benefits; mental anguish, emotional distress and loss of enjoyment of life; and all such other and different relief that this court may deem just and proper:

(a) On the First Claim, judgment against defendant Mt. Sinai in the amount of at least Two Million Dollars ($2,000,000.00) in compensatory damages, in an exact amount to be determined at trial.

(b) On the First Claim, judgment against defendant SEIU in the amount of at least Two Million Dollars ($2,000,000.00) in compensatory damages, in an exact amount to be determined at trial.

(c) On the Third Claim, judgment against defendant Mt. Sinai in the amount of at least Two Million Dollars ($2,000,000.00) in compensatory damages, in an exact amount to be determined at trial.

(d) On the Fourth Claim, judgment against defendant Mt. Sinai in the amount of at least Two Million Dollars ($2,000,000.00) in compensatory damages, in an exact amount to be determined at trial.

(e) On the Fifth Claim, judgment against defendant Mt. Sinai in the amount of at least One Million Dollars ($2,000,000.00) in compensatory damages, and in the amount of Two Million Dollars ($4,000,000.00), in punitive damages, an exact amount to be determined at trial.

(f)     On the Sixth Claim, judgment against defendant SEIU in the amount of at least Two Million Dollars ($2,000,000.00) in compensatory damages, in an exact amount to be determined at trial.

(g)     On the Seventh Claim, judgment against defendant SEIU in the amount of at least One Million Dollars ($2,000,000.00) in compensatory damages, and in the amount of Two Million Dollars ($4,000,000.00), in punitive damages, an exact amount to be determined at trial.

Dated: August 6, 2010

                                           BALLON STOLL BADER & NADLER, P.C.

                                           By: _____
                                                     Marshall B. Bellovin (MBB – 5508)
                                                     Attorneys for Plaintiff
                                                     729 Seventh Avenue, 17th Floor
                                                     New York, New York 10019
                                                     (212) 575-7900

# Exhibit 1



**JAYSON S. MYERS**
CHIEF ADMINISTRATIVE LAW JUDGE

**TERESA A. DEMEO**
**CHRISTOPHER M. TATE**
PRINCIPAL ADMINISTRATIVE LAW JUDGE

STATE OF NEW YORK
**UNEMPLOYMENT INSURANCE APPEAL BOARD**
ADMINISTRATIVE LAW JUDGE SECTION
P.O. BOX 29002
BROOKLYN NY 11202-9002
(718) 613-3500
FAX:(718) 613-3566

BEVERLY DIEGO
MARGARET O'BRIEN
LAURANCE I. PAVER
CAROL PROCOPIO
BENJAMIN H. REYES
LEONARD R. SHAPIRO
PAULA S. YORKE
HOWARD M. MEISELES
ANDREA S. ADDISON
ALTERIO A. COLETTI
SENIOR ADMINISTRATIVE LAW JUDGE

**DECISION AND NOTICE OF DECISION**
**DECISIÓN Y AVISO DE LA DECISIÓN TOMADA**

A.L.J. Case No. 009-39375
IN THE MATTER OF:

Mailed and Filed:

**FEB 1 0 2010**

**PAULETTE M WILLIAMS**
**33 DURYEA AVE**
**MOUNT VERNON NY 10550**

**THE MOUNT SINAI HOSPITAL**
**ONE GUSTAVE LEVY PLACE**
**NEW YORK NY 10029**

**WORKERS DEFENSE LEAGUE**
**PO BOX 618**
**MADISON SQUARE STATION**
**NEW YORK NY 10159-0618**

**UNEMPLOYMENT COST CONTROL**
**50 HARRISON ST STE 305**
**HOBOKEN NJ 07030-6064**

Department of Labor Office: 831

Hearing Requested: December 22, 2009

**PLEASE TAKE NOTICE** that this decision has been duly mailed on the date listed above. If you appeared at the hearing and are not satisfied with this decision, you may appeal within **TWENTY DAYS** from the date this decision was mailed. Any party who failed to appear at the hearing has the right to apply to reopen the case. For the application to be granted, the party must apply within a reasonable time and must establish good cause for its failure to appear. **READ IMPORTANT INFORMATION ON REVERSE SIDE.**

**POR FAVOR TOME NOTA** que esta decisión ha sido debidamente enviada por correo en la fecha que aparece arriba. Si usted asistió a la audiencia y no está satisfecho con la decisión, usted puede apelar dentro de los **VEINTE DIAS** a partir de la fecha en que esta decisión fué enviada por correo. Cualquiera de las partes que falle en comparecer a la audiencia, tiene derecho de aplicar para que reabran su caso. Para que la apelación sea aceptada, la parte interesada debe aplicar dentro de un período de tiempo razonable y debe establecer buena causa por no haber comparecido a la audiencia. **LEA INFORMACIÓN IMPORTANTE AL REVERSO.**

**DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)**

ISSUES: Loss of employment through misconduct.

The Department of Labor issued the initial determination disqualifying the claimant from receiving benefits effective October 3, 2009, on the basis that the claimant lost employment through misconduct in connection with that employment and holding that the wages paid to the claimant by The Mount Sinai Hospital prior to October 3, 2009 cannot be used toward the establishment of a claim for benefits. The claimant requested a hearing.

AB 665-0 (10/06)

A hearing was held at which testimony was taken. There was an appearance by the claimant.

FINDINGS OF FACT: Claimant was a patient care assistant with the employer, a medical center and hospital, from 1989 until October 2, 2009. Her duties included drawing blood, weighing patients and assisting patients in a variety of ways. When a patient was confused, claimant would sometimes be assigned to watch that one patient only to make sure the patient did not wander. Claimant's shift was from 11:15 p.m. until 7:15 a.m. When she arrived at work, claimant was supposed to get her night's assignment at the nursing station. Additionally, claimant would receive a report on the status of her patient or patients from the patient care assistant she was relieving and from a nurse who would come to the patient's room early in claimant's shift. On October 2, 2009, claimant saw the patient care assistant she was to relieve when she arrived at work. The assistant told claimant the room to which claimant was assigned and also gave her information about both patients in the room. Claimant understood that she was to take care of both patients. Claimant trusted the other patient care assistant and did not double-check her assignment at the nursing station. However, claimant had, in fact, been assigned to provide one-to-one observation of only one of the patients. No nurse ever came to the room to provide claimant with the status of the patient or patients under her care. During the night, the patient who was confused got up and wandered into the hall while claimant was adjusting the bed for the other patient in the room. Claimant had never received a warning or had any disciplinary taken against her. On October 2, claimant was suspended, and on October 9, 2009, she was terminated, for not closely watching the patient who wandered into the hall on October 2, 2009.

OPINION: Pursuant to Labor Law § 593 (3), a claimant is disqualified from receiving benefits after having lost employment through misconduct in connection with that employment. Pursuant to Labor Law § 527, the wages paid in such employment cannot be used to establish a future claim for benefits.

The credible evidence establishes that claimant was fired for not closely watching a patient she had been assigned to observe on a one-to-one basis on October 2, 2009. The claimant testified credibly and consistently that she had spoken to the patient care assistant on the prior shift to get her instructions for the night and that no nurse ever came to the room to give her instructions. Neither the patient care assistant nor any nurse had told her that she was to watch only the one patient who wandered. Claimant acknowledges that she should have double-checked her assignment at the nursing station, and that had she done so, she would have known that she was to watch the one patient only. In her twenty years with this employer, however, claimant was never warned about patient care or not checking at the nurse's station. Therefore, I conclude that this isolated incident did not constitute misconduct and that claimant lost her job under non-disqualifying circumstances.

DECISION: The initial determination, issue, is overruled.

The claimant is allowed benefits with respect to the issues decided herein.

/s/ Rosalie Wohlstatter
**Administrative Law Judge**

## NOTICE OF DECISION

### CLAIMANTS

**IF YOU DISAGREE WITH THIS DECISION, YOU HAVE A RIGHT TO APPEAL TO THE UNEMPLOYMENT INSURANCE APPEAL BOARD.**

Parties may be represented by lawyers or other persons of their choice on appeal to the Appeal Board. For representing a claimant, a lawyer or an agent registered by the Appeal Board may charge a fee. The fee must be approved by the Appeal Board before payment may be accepted by such lawyer or agent. No other person may charge a fee for representing a claimant. If you do not have enough money to hire a lawyer or registered agent, you may be able to get one free through your local Legal Aid Society or Legal Services Program.

### TO APPEAL A DECISION

1. Continue to follow **all** instructions from the Unemployment Insurance office where you originally filed your claim and to certify for benefits as long as you are unemployed and claiming benefits. This will protect your rights to any benefits you claim.

2. Within twenty (20) days of the date printed on the face of this decision, mail a letter to the office where you originally filed your claim or to the Appeal Board at P.O. Box 15126, Albany, New York 12212-5126, or fax your appeal to the Appeal Board at (518) 402-6208. Please state that you wish to appeal and the reasons for your appeal. Include your ALJ Case Number (found just above your name on the face of the Notice of Decision) and a copy of the Notice of Decision.

3. Claimants who appeal are **not** required to pay a deposit on filing an appeal.

### EMPLOYERS

If you wish to appeal this decision, you may file a notice of appeal within twenty (20) days from the date printed on the face of this decision to the office where the claim was originally filed and which issued the initial determination, or to the Unemployment Insurance Appeal Board at P.O. Box 15126, Albany, New York 12212-5126, or you may fax your notice of appeal to the Appeal Board at (518) 402-6208. Such notice of appeal should include the A.L.J. Case Number (found on the face of this Notice of Decision), the reason(s) for the appeal and a copy of the Notice of Decision.

**ALL PARTIES WILL RECEIVE A NOTICE OF RECEIPT OF APPEAL DIRECTLY FROM THE APPEAL BOARD AFTER ANY APPEAL IS MADE.**

## INSTRUCCIONES A LOS RECLAMANTES

### RECLAMANTES

**SI NO ESTÁ DE ACUERDO CON ESTA DECISIÓN, USTED TIENE DERECHO DE APELARLA A LA JUNTA DE APELACIONES DEL SEGURO POR DESEMPLEO.**

Las partes si lo desean, pueden estar representadas por abogados u otras personas que ellos seleccionen en la apelación a la Junta de Apelaciones (Appeal Board). Un abogado o un agente que esté registrado por la Junta de Apelaciones, puede cobrale honorarios por representarle. Estos honorarios deben ser aprobados por la Junta de Apelaciones antes que el pago pueda ser aceptado por dicho abogado o agente registrado. Ninguna otra persona podrá cobrar honorarios por representar al reclamante. Si usted no tiene suficiente dinero para contratar a un abogado o un agente registrado, puede conseguir uno gratis a través de la Sociedad de Asistencia Legal (Legal Aid Society) o el Programa de Servicios Legales (Legal Services Program).

### PARA APELAR LA DECISIÓN

1. Continúe siguiendo **todas** las instrucciones de la oficina del Seguro por Desempleo (Unemployment Insurance) donde usted presentó su reclamo originalmente y para certificar por los beneficios mientras permanezca desempleado y esté reclamando beneficios. Esto protegerà su derecho a recibir cualquier beneficio que reclame.

2. Antes de cumplirse veinte (20) días de la fecha que aparece al frente de esta decisión, envíe una carta a la oficina donde presentó originalmente su petición o al Appeal Board a P.O. Box 15126, Albany, New York 12212-5126, o envíe por fax su apelación al Appeal Board al (518) 402-6208. Por favor, explique que desea apelar y las razones que tiene para hacerlo. Incluya su número de caso ALJ (lo encontrará justo encima de su nombre al frente de este Aviso de Decisión) y envíe una copia de este Aviso de Decisión.

3. Los reclamantes **no** necesitan depositar dinero para poder apelar su caso.

**TODAS LAS PARTES RECIBIRÁN UN AVISO DE RECIBO DE APELACIÓN DIRECTAMENTE DE LA JUNTA DE APELACIONES DESPUÉS DE QUE SU PETICIÓN SEA RECIBIDA.**

AB 665 (03-01)